LYDE GRIFFITH *vs.* THE FREDERICK COUNTY BANK, *et al.*
*December*, 1834.

A deed executed to indemnify endorsers, who became such for the grantor at his request, is founded upon a good consideration, and vests his interest and estate in, and title to, the property conveyed, in the grantees, until it has performed its office of indemnifying them from responsibility ; it cannot be impeached at the instance of a creditor, whose pretensions can only be considered equally meritorious.

Indemnity is a good consideration within the Statute of Frauds ; and the Statute of Elizabeth does not extend to conveyances made upon good consideration and *bona fide*.

When contracts are rescinded, the parties must be restored to their former rights, and placed in the same situation in which they stood anterior to the contract.

Whenever a court of Equity is prevailed upon to set aside an agreement, it will be on refunding what has been *bona fide* paid, and making allowances for improvements.

A creditor at large before judgment, and before he has a certain claim upon the property of his debtor, has not a right to call for a specific execution of his debtor's contracts, for the creditor's benefit. Neither can the creditor, in such case, ask for a rescinding of the contract.

The court of Chancery, in decreeing a specific execution of agreements, exercises a discretion regulated by fixed and established rules.

In a contract for the sale of lands, when the parties stipulated that "in case they could not agree on the price, we do agree to leave the same to two disinterested men to fix between us," and the price was to be paid in the year following, and the parties had not fixed the price either by themselves or by arbitrators appointed for that purpose, a court of Equity will not decree a specific performance. Whether such a contract is valid under the Statute of Frauds, *Quere.*

To vacate a decree obtained against a man of intemperate habits, there must be evidence that advantage was taken of his indiscretion, or that he was improperly practised upon in obtaining the decree.

A creditor whose rights are ascertained by judgment, as against real property, and by judgment and execution, as against personal property, may proceed

in Equity to redeem outstanding mortgages against either, for the purpose of applying any surplus to the payment of his debt, and be entitled to a preference according to his legal priority.

The case of *Birely vs. Staley*, 5 *G. and J.* 432, confirmed.

A creditor can only call upon a court of Equity to sell the real estate of his deceased debtor, under the Act of 1785, *ch.* 72, upon the ground of the insufficiency of the personal estate to pay his debts. The jurisdiction of the court depends upon the condition therein mentioned. Such insufficiency ought to be alleged in the pleading, and established by the proof.

Under the Act of 1795, *ch.* 88, the Chancellor is authorised to decree a sale of equitable titles or claims to land for the payment of debts, but that jurisdiction is exercised upon the terms prescribed by the Act of 1785, *ch.* 72.

Where the court of Chancery dismisses a bill absolutely, which ought to be dismissed without prejudice to future proceedings by the complainants, that error is corrected by reversing the decree appealed from, and passing a new decree; and in this case, the appellant was decreed to pay costs in both courts.

APPEAL from the court of Chancery.

This bill was filed by the appellant against the appellees, on the 22d of October, 1829, and *Bland*, Chancellor, having dismissed it with costs, he appealed to the court of Appeals. The pleadings are stated by the judge, who delivered the opinion of this court, as follows:

The complainant charges in his bill, that *John* and *Ephraim Etchison*, the last of whom had departed this life, become indebted to him in a certain sum of money, and that *Ephraim*, in his life-time, and at the time of his death, was seized and possessed of real and personal estate, of great value; part of which was held by him in severalty, and other part in common with the said *John*. That *Ephraim*, at his death, left certain legal representatives, whom he names, and who he charges are entitled to the surplus of his personal estate. He charges that he is entitled to an amount of the aforesaid property, and that the same ought to be applied, under the direction of the court, to the payment of his claims, and other creditors of said *Ephraim*. He charges that said rights are in danger of being impaired, if not entirely destroyed, by the false and fraudulent proceedings therein after mentioned. The bill

then states, that a certain *Joshua Stewart, Charles D. War-
field*, and the *President and Directors of the Frederick
County Bank*, filed their bill of complaint against the said
*John Etchison*, wherein they charged, that *John* and
*Ephraim Etchison* in his life-time, conveyed certain real
and personal estate unto said *Joshua* and *Charles*, in trust,
to secure the payment of a certain note drawn by the said
*Ephraim* and *John*, and endorsed by said *Joshua* and
*Charles*, and discounted by said bank, for the sum of four
thousand dollars, and that default had been made in pay-
ment of said note, and in consequence thereof, prayed a
sale of said trust property, to be decreed by the court.
That said bill was answered by *John Etchison*, the sole
defendant. That a decree was accordingly passed, and that
said *Stewart* and *Warfield* were appointed trustees to make
the sale. That the trustees sold the personal estate, and
had advertized the real estate to be sold. The bill then
charges, that said proceedings are fraudulent and irregular,
and have been prosecuted by the complainants, with a
single eye to their own advantage, and with an utter dis-
regard to the interest of the other creditors of said *Ephraim*
and *John;* on behalf of whom, as well as for himself, he
makes the following objections to said decree and proceed-
ings. In the first place, he charges, that said *John Etchi-
son* is a very weak-minded man, and addicted to the
intemperate use of spirituous liquors; that when sober, he
is unable to manage his affairs with common discretion.
The bill further charges, that complainants availed them-
selves of his unfortunate propensities, to obtain from him
an answer and decree to which they were not in equity
entitled. That the complainants in their bill alleged that
the property conveyed in trust, was held by *John* and
*Ephraim*, in a co-partnership capacity, with the fraudulent
view of bringing *John* alone before the court, upon whom
they could easily practice, and bind the rights of the
representatives of *Ephraim*, without giving them an oppor-
tunity of making their defence. The bill denies the

alleged partnership, and refers to the deed of trust, whereby it avers it will appear, that at least part of the property thereby conveyed, was of the several estate of said *Ephraim.* The said proceedings are then objected to, because the heirs at law and personal representatives of *Ephraim* were not made parties thereto. The bill then charges, that part of the property conveyed in trust, to wit, the property called the "*Great Meadows,*" was purchased by said *Ephraim* and *John,* of a certain *Mahlon Chandler* and *Joshua Pearce,* and *Hannah* his wife, for the price of nine thousand six hundred dollars, or thereabouts, the greater part whereof has been paid; but that the said *Ephraim* and *John* have never obtained a legal title to said land. It further charges, that *Chandler, Pearce* and wife, although they fraudulently persuaded said *Ephraim* and *John,* that they could give them a good title, yet in fact had no title to the said property in fee simple, and that in case of a failure of title of said vendors, the payment of the balance of the purchase money could not be enforced, but that on the other hand, the said *John,* and the proper representatives of the said *Ephraim,* could compel the said vendors to refund the monies which have been already paid on account of said land; but that if the said decree should remain in force, and that if the trustees should be permitted to proceed with the sale of the real estate, the right of the vendees to rescind the contract, and recover back the money already paid, will be entirely destroyed, and that it would be doubtful, whether a purchaser under said trustees could avail himself of the defect of title of the vendors, as a defence against their claim for the balance of the purchase money, contracted to be paid by the said *John* and *Ephraim,* and that an execution of the decree would operate as a premium and encouragement to fraud; that it would afford to the said vendors a complete shield against every endeavour to deprive them of the fruits of their fraud and injustice, and will enable the complainants in that suit to perpetrate a fraud equally injurious to the other creditors of said *John* and *Ephraim.*

The bill then charges, that the proceedings are defective, inasmuch as the parties having, or pretending to have, the legal title, are not before the court, and because the extent of the lien of the vendors ought to be ascertained before the land is subjected to the operation of a new incumbrance. The bill further charges, that before the date of the said deed of trust, the said *Joshua* and *Charles* had endorsed a note for the said *Ephraim* and *John*, to the amount of two thousand dollars or thereabouts, which note was discounted by said bank ; that upon discounting the aforesaid note for four thousand dollars, part of the money received thereon, to wit. the sum of seventeen hundred and sixty dollars, or thereabouts, was applied to the payment of a balance due on the above note discounted for two thousand dollars, and the balance thereof was with the assent of the said *Charles*, received by the said *Joshua* in trust, to be applied to the discharge of certain debts, due and owing from said *John* and *Ephraim*, a large part of which sum, it is alleged, has been fraudulently converted by said *Joshua*, to his own use, which ought to be credited on said note last discounted. The bill then charges, that the said Bank cannot claim but as assignees of the said *Joshua* and *Charles*, and to the extent to which the said *Joshua* and *Charles* could themselves claim, in case said note was now held by them. The bill then charges, that the said *Joshua* and *Charles* have, by their fraudulent artifices, prevented the granting of letters of administration on the estate of said *Ephraim ;* at one time, persuading the said *John* to claim the personal estate as partnership property, and when this pretext failed them, they conspired together with a certain *Ephraim Gaither* (of *William*,) of *Montgomery* county, and under colour of a writ of execution, issued out of *Montgomery* county court, by said *Gaither*, seized upon all the personal estate of the said *Ephraim*, and sold the same to divers persons, at prices very far below its value. The bill charges, that said proceedings were fraudulent, irregular, and void, and that the said *Joshua, Charles,* and

*Ephraim*, as executors in their own wrong, are account-
able for the reasonable value of said personal estate to the
creditors of said *Ephraim*. The bill then charges, that
some time in the year 1818, complainant agreed to pur-
chase from said *Ephraim* and *John*, part of " *Great Mea-
dows*," supposed to contain about the quantity of twenty-
five or thirty acres, the price of which was to be settled by
two disinterested persons, to be chosen by the parties, and
that it was afterwards verbally agreed between the parties,
that the complainant should allow a credit on his said claim
for the amount of said purchase money, which purchase he
is still willing and desirous to complete. The complainant
states that he is willing that a survey be had under the
authority of the court, to ascertain the exact quantity of
land sold, and that arbitrators should be appointed to value
said land, but that he is advised that he ought not to be
compelled to execute said agreement; unless he can obtain
a good title to said land, and that he cannot obtain a title
except by the aid of this court, and with the concurrence
of the said *Mahlon Chandler*, and *Joshua Pearce* and
*Hannah* his wife. The complainant also charges, that the
said *Joshua* and *Charles* had notice of his agreement before
the date of said decree, and yet made no reservation of his
rights therein ; nor was he made party thereto. This is a
full statement of the complainant's case, as detailed in his
bill, and upon which he claimed the equitable interposition
of the court below. After prayingf or a discovery, from
the heirs of *Ephraim Etchison*, of all the estate, real and
personal, he was seized or possessed of, or entitled to, at
the time of his death, and that *John Etchison* might dis-
cover all property, real and personal, wherein he had an
interest, jointly or in common with said *Ephraim ;* and that
said *Stewart* and *Warfield* might discover how much of the
money obtained from said Bank was paid to said *Stewart*,
and how the same has been applied by him ; and that said
*Stewart, Warfield* and *Gaither*, might discover by what
authority, and under what pretences they seized upon and

possessed themselves of the personal estate of the said *Ephraim*, deceased ; and might set forth a particular account thereof, and of the manner in which they had disposed of the same; and that the said *Chandler*, *Pearce* and wife, might discover the particulars of their agreement with said *Joshua* and *Ephraim*, for the sale of said tract of land called " *Great Meadows*," and how much money has been paid on said agreement, and how much is now due on account thereof; and might also set out their title to said lands. The bill then proceeds to make the following prayer, " that payment of your orator's aforesaid claim may be decreed according to the usages and practice of this court; and that the said *Joshua Stewart*, and *Charles D. Warfield* and *Ephraim Gaither*, as executors in their own wrong, may be charged with the value of the aforesaid personal estate, so taken into their custody ; and that in case the said *Mahlon Chandler*, and *Joshua Pearce* and *Hannah*, his wife, have good title to the aforesaid land called " *Great Meadows*," a specific execution of said agreement and payment of the balance of the purchase money may be decreed to them; and in case of a failure of title, then, that the aforesaid agreement may be rescinded; and that the said *Mahlon Chandler*, *Joshua Pearce*, and *Hannah* his wife, may be decreed to bring into this court the monies so received by them, to be applied to the payment of the debts due from said *John*, and *Ephraim*, deceased; and that all the real estate, wherein the said *Ephraim*, deceased, was interested in any manner, may be sold, and the proceeds distributed under the authority of this court; and that the aforesaid decree may be reviewed and set aside ; and that your orator may have such other relief as his case may require.    The contract of purchase stated in said bill, is in the following terms :

" An article of agreement made and entered into this 18th December, 1818, between *Ephraim* and *John Etchison* of the one part, and *Lyde Griffith* of the other part, witnesseth, That the aforesaid *John* and *Ephraim Etchison*

agree to and with the said *Lyde Griffith*, to sell him all the land lying south of the branch, running down by the beginning of "*Star's Fancy*," and in case we cannot agree on the price for the same, we do agree to leave the same to two disinterested men, to fix between us ; we also suppose the quantity to be between twenty-five and thirty acres, for which payment the said *Lyde Griffith* agrees to make on or before the first day of July next."

The answer of the *President and Directors of the Frederick County Bank*, admits that they discounted the note of *John* and *Ephraim Etchison*, for four thousand dollars, which was endorsed by said *Stewart* and *Warfield*, and was then due and unpaid ; and say, that they held the said drawers and endorsers responsible to them for the payment of the same. The said President and Directors, in their answer, also claim the benefit of the deed of trust executed by the said *Ephraim* and *John* to said *Stewart* and *Warfield*, as their endorsers for their indemnity, as security to them for the payment of said note.

The answer of *Warfield* and *Stewart* denies the frauds charged against them, and avers that they became endorsers on the said *Ephraim* and *John Etchison's* notes for their accommodation, and relying upon the security afforded by said deed of trust, for the payment of said notes. They state, that they obtained the decree to sell property to pay said notes. They deny the mental imbecility of *John Etchison*, and that any advantage was taken of him in obtaining his answer. They allege that if it be true as stated, that the said *Ephraim* and *John* have not obtained a good title to part of the property they conveyed to them, they have been imposed upon by said *Ephraim* and *John*, and have not all that security for the payment of the debt contracted at the Bank aforesaid, which the deed of trust professed to give them. They expressly aver, that they were induced to endorse said notes in consequence of the indemnity afforded them by said deed of trust, and deny generally, all the allegations of complainant's bill against them.

The answer of *Gaither* denies all fraud and combination charged against him, and states, that the property sold by him was to satisfy judgment obtained by him against the *Etchisons* in *Montgomery* county court.

The answer of *Chandler, Pearce* and wife, admits the contract of sale to the *Etchisons,* but denies all fraud in making the same. It states that they supposed they had good title to the land at the time the contract was made, and never understood till afterwards, that it was doubtful or questionable.

The answer of *John Etchison, Elijah P. Etchison,* and *Peregrine Etchison,* admits the claim of the complainant against said *John,* and *Ephraim,* deceased, as stated in his bill. That said *Ephraim* left considerable personal estate, but the same has been almost entirely wasted and destroyed by the proceedings of the defendants, *Stewart, Warfield* and *Gaither,* and by the sheriff of *Montgomery* county. They state, that besides the real estate mentioned in the deed to the defendants, *Stewart* and *Warfield,* there is other real estate in which the said *Ephraim* had an estate or interest, either several, or in common with said *John.* They admit the complainant's title to relief, and submit to such decree as may be just.

The answers of *James M. Etchison, Frederick Etchison, Jason Etchison, Osbourn Etchison,* and *Ruth Ann Etchison,* the infants by their guardian admit the claim of the complainant against the said *John* and *Ephraim Etchison,* as stated in his bill. They state that said Ephraim left considerable personal estate, but the same has been almost entirely wasted and destroyed by the proceedings of the defendants, *Stewart, Warfield* and *Gaither,* as is stated in complainant's bill, and by the sheriff of *Montgomery* county ; that besides the real estate mentioned in the deed to the defendants, *Stewart* and *Warfield,* there is other real estate in which the said *Ephraim* had an estate or interest, either several, or in common with said *John Etchison.* The above is the substance of this case, as detailed in the bill and answers.

The appeal came on to be argued before BUCHANAN, Ch. J., and STEPHEN and ARCHER, Judges.

*Alexander* for the appellant, contended,

1. That the deceased *Ephraim Etchison* left real estate sufficient for the payment of the claims of his general creditors, and the decree should have provided for their payment by its sale. *Act of* 1785, *ch.* 72, *sec.* 5.

2. That the legal title to the tract of land called " *Great Meadows,*" being supposed to be in the defendants, *Chandler* and *Pearce*, they were proper parties to this suit. The validity of their title, and the consequent validity and operation of the agreement between them, and *John Etchison*, and the deceased, were proper subjects for discussion in this suit, and ought to have been determined by the decree. Equitable interests in real estate may be sold by the *Act of* 1795, *ch.* 88, *sec.* 2.

The Chancellor could, and ought to have inquired into the title of these parties, and, consequently, one of the questions now to be decided is, what that title was. Whether it was good or not, depends upon whether the word " issue" in a deed, is a word of limitation, or of purchase; and that it is a word of purchase in a deed, is clear upon authority. 4 *Harr. and Johns.* 439. 4 *Kent's Com.* 222. 4 *Term. Rep.* 294. 2 *Atk.* 582.

If the title of *Chandler* and others is defective, the contract between them and the *Etchisons* should be rescinded, and the purchase money already paid returned for the benefit of the creditors of the vendees; and the money so paid, being a lien on the land, it should be sold for the satisfaction of the claim. *Sugden's vendors,* 365. 2 *H. and G.* 273.

*Magruder, Johnson,* and *R. J. Bowie,* for the appellees.

The relief prayed against *Chandler* and *Pearce* is, that they should bring the money received by them into court, and this upon a bill not filed by the original vendees, the

*Etchisons*, but by him who claims as a general creditor, and a sub-purchaser of a part of the property.

Now, if this complainant has the same right to vacate the contract, as the original vendees, he should surely show a readiness to perform the contract on his part, by paying the balance of the purchase money. To entitle him to demand performance of the other party, he must show a readiness to perform himself. This is the rule at law, when damages are claimed; and a court of Equity will never interpose in behalf of a party who could not recover damages at law.

The *Act of* 1795, *ch.* 88, does not apply to a case like the present. That act only relates to equitable titles founded upon valid and subsisting contracts. When such a title exists it may be sold; but in a case like the present, when the contract is sought to be rescinded, upon the ground of a defect in the vendor's title, the act does not apply, because if the foundation of the application to the court is true, that is, that the vendor's title is defective, there is nothing to sell.

The vendees are in the possession of the land, and the court will not rescind the contract, without an offer to surrender the possession, which is not made. A defect in the title at the date of the contract is not a sufficient ground for setting it aside, provided it be perfect when the vendee is in a condition to call for a conveyance; and he can only do that, when he is prepared to perform it on his part by paying, or offering to pay the purchase money, which is not the case here. This court cannot say, but that the vendors, at the proper time, would have been prepared with a good title. With respect to so much of the bill as relates to *Ephraim Gaither*, his judgment at law against the *Etchisons*, and sale of property under the *fi fa.* for its satisfaction, it is sufficient to say that there is not a particle of proof in support of any of these charges; and the various frauds alleged against the bank, and *Stewart* and *Warfield*, are also all denied and disproved.

STEPHEN, J. delivered the opinion of the court.

The complainant in this cause seeks the aid of this court in two distinct characters;—as a creditor of *Ephraim* and *John Etchison*, and also as a purchaser of a part of the tract or parcel of land called the "*Great Meadows.*" In both these capacities, he seeks to affect property, which had been conveyed by his debtors, and which had been decreed to be sold for the purpose of satisfying the objects of such conveyance. His bill is a bill both for discovery and relief. In the first place, we think it clear beyond a shadow of doubt, that the complainant is entitled to no relief against *Stewart, Warfield,* and *Gaither,* whom he attempts to charge as executors in their own wrong of *Ephraim Etchison.* The allegations of his bill, as to any improper intermeddling by them with the personal estate of said *Etchison,* being wholly unsustained by proof. *Gaither* was a creditor of *Etchison* by judgment, regularly and legally obtained in *Montgomery* county court; to satisfy that judgment, he issued an execution, and placed it in the hands of the sheriff of the county, by whom the property of the defendant was sold to satisfy the debt due upon it. In the whole of this proceeding, there is not a *scintilla* of proof of any improper or illegal interference, by either *Warfield, Stewart,* or *Gaither.* The complainant in his bill then prays, " that in case the said *Mahlon Chandler,* and *Joshua Pearce,* and *Hannah* his wife, have good title to the aforesaid land called "*Great Meadows,*" a specific execution of said agreement, and payment of the balance of the purchase money may be decreed to them ; and in case of a failure of title, then that the aforesaid agreement may be rescinded, and the said *Chandler, Pearce* and wife, may be decreed to bring into court the moneys received by them, to be applied to the payment of the debts due from said *John,* and *Ephraim,* deceased." We think the court below were also correct, in refusing the relief so prayed, because the complainant, under the circumstances of the case, and according to the clearest principles of equity and justice, was not entitled to

it.   On the sixteenth day of June, 1829, *John* and *Ephraim Etchison* being about to obtain a loan of four thousand dollars from the *Frederick County Bank,* solicited *Joshua Stewart* and *Charles D. Warfield* to become their endorsers, to enable them to effect said loan.   To induce them to do so, they executed to them on that day a deed of indemnity, by which the tract of land called the " *Great Meadows,*" together with other property, was conveyed with a power of sale in case the note endorsed by them and discounted by said bank should not be paid, when payment thereof should be demanded.   This deed vested in *Stewart* and *Warfield* all the interest, estate and title of *Ephraim* and *John Etchison,* to the property thereby conveyed, until it had performed its office of indemnifying them against loss, in consequence of the responsibility incurred by them by reason of their said endorsement.   It was a deed founded upon a good consideration, and could not be impeached, invalidated or set aside at the instance of a creditor, whose pretensions could only be considered equally meritorious. That such a deed is founded upon a good and valid consideration, see 2 *Johns.* 306, where *Chancellor Kent* says— " indemnity is a good consideration within the statute of frauds."   See, also, to the same effect, 3 *Cranch,* 73, where the chief justice says,—" The deed is made to save *Hooe* harmless, on account of his having become the security of *Fitzgerald* to the *United States,* and on account of notes to be endorsed by *Hooe* for the accommodation of *Fitzgerald* in the *Bank of Alexandria.*"   These are purposes for which it is supposed this deed of trust could not lawfully have been executed; and the deed has been pronounced fraudulent under the statute of 13*th of Elizabeth.*   That statute contains a proviso, that it shall not extend to conveyances made *upon good consideration* and *bona fide.* The goodness of the consideration in the case at bar has been admitted.   " This deed of indemnity being then founded upon a good and valuable consideration, it would have been repugnant to every principle of justice and equity, to

take from the grantees the security thereby afforded to them; and it is quite clear, that in no other way and upon no other terms, could the contract have been rescinded as prayed for by the complainant in his bill." In such cases the parties must be restored to their former rights, and placed in the same situation in which they stood anterior to the contract. Whenever a court of Equity is prevailed upon to set aside an agreement, it will be on refunding what has been *bona fide* paid, and making allowances for improvements. 2 *Powell on Con.* 143. It is true, the prayer of the bill does not absolutely ask for a rescinding of the contract, but is in the alternative, that in case *Chandler, Pearce* and wife, have good title to the said land, a specific execution of said agreement, and payment of the balance of the purchase money may be decreed to them. It is necessary to consider what was the capacity in which the complainant stood before the court in order to ascertain his right or title to call upon it to administer to him this relief. He states himself in his bill to be a creditor of the *Etchisons*, and a purchaser from them of a part of the land conveyed by them to *Warfield* and *Stewart*, called the "*Great Meadows.*" As a creditor at large, and before judgment, and before he has a certain claim upon the property of his debtor, has he a right to call for a specific execution of the contract in his behalf? We think he has not. A leading case on this subject, and which is frequently referred to for the principle decided by it, and particularly by *Chancellor Kent*, in 2 *John. C. R.* 145, is to be found in 1 *Vernon,* 399—the case of *Angell vs. Draper.* In that case the bill stated, that the plaintiff had obtained judgment against I. S. for £100, and that the defendant upon pretence of a debt due to himself, and to prevent the plaintiff's having the benefit of his judgment, had got goods of I. S. of great value into his hands, sufficient to satisfy his debt with a great overplus, and prayed an account and discovery of these goods. The defendant demurred, because the plaintiff had not alleged that he had sued out execution, and had actually taken out *fieri*

*facias*; for until he had so done the goods were not bound by the judgment, nor the plaintiff entitled to a discovery or account thereof. *Per. Cur.* Allow the demurrer. The plaintiff ought actually to have sued out execution before he had brought his bill. This case establishes the principle, that the creditor, until he has established a certain claim or lien upon his debtor's property, has no right to call for an account and discovery of such property, in the hands of a stranger or third person. If he has not, it is conceived that the same principle forbids his interference with the disposition of his debtor's property, and disables him from calling for a specific execution of the contract in this case, upon the ground merely that he is a creditor, and may ultimately have a claim upon it for the satisfaction of his debt. In 2 *Johns.* 144, 145, the same doctrine is sanctioned and established by *Chancellor Kent,* where he delivered the following opinion, which, as it is short, and strongly impressive of his views and sentiments upon the subject, we shall give at length; he says—" This is a case of a creditor on simple contract, after an action commenced at law and before judgment, seeking to control the disposition of the property of his debtor under judgments and executions upon the ground of fraud. My first impression was in favour of the plaintiffs; but upon examination of the cases I am satisfied, that a creditor at large, and before judgment and execution, cannot be entitled to the interference which has been granted in this case. In *Angell vs. Draper,* 1 *Vern.* 399, and *Shirely vs. Watts,* 3 *Atk.* 200, it was held that the creditor must have completed his title at law, by judgment and execution, before he can question the disposition of the debtor's property; and in *Bennet vs. Musgrave,* 2 *Ves.* 51, and in the case before *Lord Nottingham,* cited in *Balch vs. Wastall,* 1 *P. Wms.* 445, the same doctrine was declared, and so it is understood by the elementary writers. *Mitford,* 115; *Cooper's Eq. Pl.* 149. The reason of the rule seems to be, that until the creditor has established his title, he has no

right to interfere; and it would lead to an unnecessary, and perhaps a fruitless and oppressive interruption of the exercise of the debtor's rights. Unless he has a certain claim upon the property of the debtor, he has no concern with his frauds. On the strength of settled authorities, I shall accordingly grant the motion for dissolving the injunction." The object of the bill in this case was to obtain relief against judgments charged to have been voluntary, and without consideration ; and also fraudulently confessed by the debtors with intent to defraud and injure the plaintiffs. The chancellor thought that a creditor at large was not entitled to the aid of a court of Equity, for the reasons stated in his opinion; and the reasons given for that opinion would seem equally to exclude the right of such a *creditor to call for a rescinding* or specific execution of a contract of his debtor for the purchase of land, simply upon the ground of the relation of debtor and creditor alone. But the complainant alleges that he contracted to purchase from the *Etchisons* a part of the land called the " *Great Meadows,*" and many consider himself entitled to call for a specific execution of the contract upon that ground. In In the first place, it is to be observed that this court, in decreeing a specific execution of agreements, exercises a discretion, not an arbitrary one, but a sound judicial discretion, regulated by fixed and established rules ; and therefore says—2 *Powell on Con.* 221 : " no rule is better established than that every agreement to merit the interposition of a court of Equity in its favour, must be fair, just, reasonable, *bona fide,* certain in all its parts, mutual, useful, made upon a good or valuable consideration, not merely voluntary ; consistent with the general policy of a well regulated society, and free from fraud, circumvention, or surprise; or at least such an agreement must, in its effect, untimately tend to produce a just end." If any of these ingredients are wanting, or that object be not in view, courts of Equity will not decree a specific performance. A written agreement to be valid within the statute of frauds and perjuries,

must contain the terms of the contract, and particularly the price to be paid. 1 *Powell on Con.* 290, 291. Otherwise, says *Powell*, all the dangers of perjury which the statute was meant to provide against would be let in to ascertain the agreement;—so in 1 *John.* 279, *Chancellor Kent* says: " The memorandum appears to be utterly defective. It ought to have stated the terms of the contract, with reasonable certainty, so that the substance of it could be made to appear, and be understood from the writing itself, without having recourse to parol proof. This is the meaning of the statute, and without which, the beneficial ends of it would be entirely defeated." So *Ib.* 280. He says : " the omission to mention the price in a letter acknowledging the contract to sell, was held by *Ld. Hardwicke* in *Clerk vs. Wright*, 1 *Atk.* 12, to be a fatal omission, rendering the written evidence of the contract too defective to take it out of the statute." In the contract of the complainant, the price to be paid for the property purchased is not mentioned. As to that part of the contract, the parties stipulate in the following terms : " and in case we cannot agree on the price for the same, we do agree to leave the same to two disinterested men to fix between us." This contract was made in 1818. By the terms of the contract the price was to be paid in the year following. No price for the property has ever yet been fixed, either by the parties themselves, or by arbitrators appointed for that purpose ; so that if lapse of time would not prevent a decree for specific performance, the complainant does not present a case which would enable a court of Chancery to decree a performance in specie. The parties have reserved to themselves the right of fixing the price in the first instance ; there is nothing to shew that any effort or attempt has been made to ascertain it ; how then could a court of Equity decree a performance in specie in such a case, if applied to for such a purpose ? It could only be done by assuming the power of fixing the price, a privilege which they have reserved to themselves by the express terms of their agreement. Whether such a

contract, leaving the price to future adjustment, would be good within the statute of frauds, we do not mean to determine. We are aware that where the price by the written agreement has been referred to arbitrators who have failed or refused to act, the court of Chancery has, under certain circumstances of hardship, assumed to itself the power of fixing the price which should be paid; but no adjudication has been found where the court has gone the length of administering relief, in the form of a specific performance, in a case in all respects analagous to the present. In *Jer. on Eq. Jur.* 442, we find the following principle stated,— " where upon a contract for the sale of property the price is not fixed, but is left to be determined by certain competent persons, this court will not force them to a decision, and will not undertake to perform the duty entrusted to them; so that if they do not fix thereon, the price being an essential part of the contract, the agreement must fail, unless under certain circumstances there has, notwithstanding the defect, been an acquiescence under it, or such a part performance that it would be inequitable not to enforce its execution. In such a case then, this court will ascertain what is the fair value." If then the price to be paid by the complainant for the land which he agreed to purchase, has not been ascertained, either by the parties or by arbitrators, and no steps have been taken by the complainant to perfect the agreement in that particular, or reduce it to certainty, he is clearly, at present, not in a situation to call for the specific execution of that agreement, and consequently, had not a right to ask the assistance of the court to cause the agreement between *Chandler, Pearce* and wife, and the *Elchisons,* to be specifically performed, because he was a purchaser under them. If his contract is a good and valid one, his interest under it cannot be bound or affected by the decree in favour of *Stewart* and *Warfield,* because he was no party to such decree; and he may hereafter resort to Chancery for relief, if the nature and circumstances of his case should require it, and he can prove himself, in all

other respects, entitled to ask it; care should be taken to make proper and necessary parties to the suit, because "the court many times, upon hearing, will not, for want of them, proceed to a decree; or if it does, the decree may be reversed; or if it be not reversed, yet none but the parties to the suit and those claiming under them, are bound by it." *Wyatt's Chan.* 299. To the same effect is 1 *Sch. and Lef. Rep.* 386, where it is said, "a decree obtained without making parties, those whose rights are affected thereby, is fraudulent and void as to those parties." The bill, for the purpose of vacating the decree, charges actual fraud in the obtaining of it; but we have perceived no proof to support that allegation. It appears, indeed, that *John Etchison*, the defendant, was a man of intemperate habits, but there is no evidence that advantage was taken of his indiscretion, or that he was improperly practised upon in obtaining the decree. The bill prays that a decree may be passed for the payment of the complainant's claim. This could only be done by subjecting to the payment of it the property included and embraced in the deed of trust from the *Etchisons* to *Stewart* and *Warfield;* or by making liable therefor any other property which they might have, exclusive of that so conveyed. Had the complainant a right to call upon the court to decree a sale of the property embraced in the deed of trust for that purpose? We think that under the circumstances of the case he had not. The complainant in this case, if a creditor at all, (and whether he will ultimately be such, depends upon a contingency) was a creditor at large; he had, at the time of filing his bill, instituted no suit at law to recover his claim; he had issued no legal process for that purpose; but he has chosen to resort to Chancery in the first instance. Had he a right to do so?—we think he had not. The property embraced in the deed to *Stewart* and *Warfield* was conveyed to them for their indemnity. The deed executed for that purpose was founded upon a valuable consideration. The debtors of the complainants had no interest in the property, except

an equitable interest, or resulting trust, at the time the bill was filed. The complainant had no right to subject that property to the payment of his debt, until the purposes of the deed of trust were fulfilled; and if he wished to make it responsible for the satisfaction of his claim, he should have filed his bill to redeem; which, as a creditor, he would have been entitled to do, after having previously taken the necessary legal steps to clothe himself with that power. To entitle himself to redeem the real and personal property conveyed by the deed, he should have obtained his judgment and issued his execution at law. In 4 *Johns. C. R.* 692, *Chancellor Kent* says,—" It may be laid down as a rule of equity, that an execution creditor at law has a right to come here and redeem an incumbrance upon a chattel interest, in like manner as a judgment creditor at law is entitled to redeem an incumbrance upon the real estate; and the party so redeeming, will be entitled in either case, to a preference, according to his legal priority." So in 1 *Pow. on Mort.* 261, 262, it is said,—" The ground for redemption seems to be the having an interest in, or lien upon the land. He that has such interest or lien may redeem; he that has none cannot." " But an equitable lien will entitle the encumbrancer to a redemption." So *Ib.* 281, it is said "to entitle a creditor to redeem, his debt must be such as creates a lien on the land." In 4 *John. Ch. R.* 622, it is said, that " a creditor, to entitle himself to the aid of this court in the recovery of his debt, must show that he has prosecuted his debtor at law, to judgment and execution, so as to have gained a legal lien and preference, at the time of filing the bill, or at least before issue joined in this court." To obtain relief in equity, the principle seems to be well settled, that the creditor must first proceed at law to the extent necessary to give him a lien upon the particular fund sought to be affected. In 4 *Johns. Ch. R.* 677, *Chancellor Kent* says,—" That the rule has been long and uniformly established, that 'to procure relief in equity by a bill brought to assist the execution of a judgment at law,

the creditor must show that he has proceeded at law to the extent necessary to give him a complete title.'" If he seeks aid as to real estate, he must show a judgment creating a lien upon such estate; if he seeks aid in respect to personal estate, he must show an execution giving him a legal preference or lien upon the chattels. In referring to those decisions, and the principles therein contained, we wish it to be distinctly understood that they are relied on solely for the purpose of shewing that the complainant in this case had not such an interest in, or claim upon his debtor's property, as to entitle him either to redeem that which had been conveyed by them as an indemnity, or to call for a specific execution of the contract of purchase made by them. We do not intend in the slightest degree to impugn or interfere with the principles contained in the case of *Birely vs. Staley, 5 Gill and Johns,* 432. If the complainant is not in a situation to ask the aid of the court in relation to the property embraced in the deed of trust, is he entitled to a decree for the sale of any real estate which might have descended to the heirs at law of *Ephraim Etchison,* and which was not embraced in said deed? The complainant, in his bill, "charges that the said *Ephraim Etchison,* in his life-time, and at the time of his death, was seized and possessed of, and entitled to real and personal estate in said county of great value; part whereof was held by him in severalty, and other part in common with the said *John.*" The bill further charges, "that the said *Joshua* and *Charles* have, by their fraudulent artifices, prevented the granting of letters of administration on the estate of the said *Ephraim,* deceased; at one time they persuaded the said *John Etchison* to claim the said personal estate as partnership property. And when this pretext failed them, they conspired together with a certain *Ephraim Gaither,* of *Montgomery* county, and under colour of a writ of execution, sued out of *Montgomery* county court, at the instance of the said *Ephraim Gaither,* seized upon all the aforesaid personal estate of the said *Ephraim,* deceased, and

sold the same to divers persons, at prices very far below its value. Your orator is advised that said proceedings were fraudulent, irregular and void, and that the said *Joshua*, *Charles* and *Ephraim*, as executors in their own wrong, are accountable for the reasonable value of said personal estate to your orator, and the other creditors of said *Ephraim* deceased." The *act of* 1785, *ch.* 72, provides,—" That if any person hath died, or shall hereafter die, without leaving personal estate sufficient to discharge the debts by him or her due, and shall leave real estate which descends to a minor, &c.," the Chancellor shall have full power and authority, upon application of any creditor of such deceased person, to order the whole, or part of the real estate to be sold for the payment of debts. In the construction of this act of assembly, this court have said in 4 *Gill and Johns.* 302,—" If personal assets come to the hands of the executor or administrator, sufficient to pay all the debts of the deceased, the creditor must look to that fund for the payment of his debts ; and if those assets are wasted, his remedy is on the official bond of the executor or administrator. The real estate of the debtor is protected, unless the personal assets are insufficient ; and to authorize the Chancellor to pass a decree to sell the real estate to pay the debts of the deceased, the bill must allege an insufficiency of personal assets for that purpose, and must sustain that allegation by proof, or the admission of the opposite party. We cannot, therefore, sustain this decree under the act of 1785, because the bill does not allege an insufficiency of personal assets to pay the debts ; and if alleged, the complainants by their own showing, disprove the allegation." The bill in this case does not charge that *Ephraim Etchison* died without leaving personal estate sufficient to discharge his debts; on the contrary, it says that—" at the time of his death, he was seized and possessed of, and entitled to real and personal estate in said county, of great value, part whereof was held by him in severalty, and other part in common with the said *John*. The personal estate, therefore, might have

been sufficient for that purpose, if the proper steps had been taken. The Chancellor has no jurisdiction under the *act of* 1785, *ch.* 72, to decree a sale of the real estate except upon the condition therein mentioned ; and this court have said, that the exercise of such jurisdiction must be warranted both by the pleadings and the proof, or the decree cannot be sustained. Nor do we think that the claim of the complainant to the aid of the court, can be sustained by the *act of Assembly,* 1795, *ch.* 88, because that act provides that the Chancellor shall have power and authority " to decree the sale of any equitable title or claim to land *in any case* in which he might on application decree the sale of a legal complete title." That act, therefore, only gives the Chancellor a right to decree a sale of the equitable estate on the same terms and conditions, as it invests him with power to decree a sale of the legal estate; which, as we have already observed, is only where it is alleged and proved, that the personal estate left by the deceased was insufficient for the payment of his debts. But in this case, according to the complainant's own showing in his bill, it may ultimately turn out, that he will have no rights as a creditor of the *Etchisons ;* on the contrary, it may be that he will finally become their debtor ; because it appears by the terms of this contract, as stated by himself, that the price of the land, when ascertained, is to be deducted from the debt due to him ; and as neither the price nor the quantity of the land have been ascertained, *non constat,* whether he will ultimately be a creditor to any amount, when the contract in these particulars shall be fully consummated ; for it may be that the price of the land purchased, when ascertained, will absorb the whole of his present demand, and thereby deprive him of any standing in court as a creditor. But the Chancellor erred in dismissing the complainant's bill absolutely, when the dismissal should have been without prejudice, to any future proceeding he may think proper to institute.

The decree, for this reason, must be reversed, but the appellant will be decreed to pay the appellees the costs incurred by them in this court, and in the court of Chancery.

DECREE REVERSED ACCORDINGLY.