ELLEN B. WARFIELD AND OTHERS, *vs.* NICHOLAS OWENS AND OTHERS.—*December* 1846.

The rents and profits of the real estate of a deceased debtor, whose personal estate is insufficient for the payment of his debts, and which accrued before a sale under a decree, at the suit of his creditors, is responsible in equity for their payment.

The heirs of the deceased debtor, or any other person receiving the same after his death, and before a sale, will, in equity, be considered as receiving the same for the benefit of such creditors.

Upon a proper bill filed for the recovery of such rents and profits, the receivers thereof will be made to account with the creditors of the deceased.

This accountability results from a clear principle of equity jurisdiction, that where the right is clear, and the law can give no adequate remedy, a court of chancery will relieve.

Where the accountability for rents and profits is established, a court of equity may, in a proper case, appoint a receiver thereof, or impose upon the tenant of the estate an occupation rent.

But where a bill seeks no relief out of rents or profits, and merely calls for a sale of the realty, in aid of the personalty, the latter being alleged to be insufficient, and the defendants deny the existence of the debt on which the bill proceeds, the insufficiency of the personalty, and plead limitations, and the proof taken did not establish such insufficiency, the complainants cannot ask either for an injunction to restrain unskilful cultivation, the appointment of a receiver, or an occupation rent.

To entitle a creditor, seeking to sell real estate for the payment of debts, to an order for injunction to restrain wasteful or unskilful cultivation, the appointment of a receiver of the rents and profits, before decree, or payment of an occupation rent, as against the widow and infant heirs of the deceased debtor, he must show, that it was necessary for his protection from loss, or that he had a right to demand it, because of the certainty or strong probability, that the real and personal estate of the deceased, would be insufficient for the payment of all the creditors of the deceased.

Fear and belief, unsustained by facts establishing their probability, or showing them to be well founded, are not a sufficient foundation for the interposition of a court of equity, by way of injunction, or for the imposition of an occupation rent.

The real estate of a deceased debtor is not primarily liable for the payment of his debts; for that purpose, it is but an auxiliary to the personal fund, and is only answerable to creditors to the extent of the deficiency of the latter.

APPEAL from the Court of Chancery.

On the 26th February 1844, *Nicholas Owens, James T. Henderson,* and *Nicholas R. Warfield,* in behalf of themselves, and all other creditors of *Eli G. Warfield,* deceased, filed their bill, setting forth their respective claims against him at the time of his death, intestate, in the year 1841; that administration of his personal estate was granted to his widow, *Ellen B. Warfield,* and *Reuben Warfield,* who had possessed themselves of the said *E. G. W's* estate, and admitted the complainants' claims against him. The bill charged, that the deceased's personal estate will be insufficient for the payment of his debts, and that he was, at the time of his death, seized and possessed of valuable real estate, which descended to his infant children, *Frances E., Susanna,* and *Magruder Warfield;* that the real estate, in the hands of his children, will be liable for the payment of his debts, in case of a deficiency of the personal estate for that purpose; that one of the notes of the deceased, mentioned in the bill, due to complainants, was given for the purchase money, of part of the land of which *E. G. W.* died seized, and is claimed by the assignee as a lien thereon, as for purchase money and interest. Prayer, for an account of the personal estate in the hands of the administrators, its application to debts of the deceased, and, in the event of its insufficiency, for a sale of the real estate for that purpose; for general relief, and for subpœna for the widow, administrators, and infant children of deceased.

The promissory notes described in the bill were exhibited with it.

The infants answered the bill, under commission, and did not admit its allegations.

The widow, *E. B. W.,* filed her answer, admitted the signature of the several notes, but denied they were ever obligatory upon her husband, and demanded strict proof of their consideration; and if founded upon value, they have long since been paid, &c. The answer also relied upon the act of

limitations; that the complainants were indebted to the deceased. The alleged lien on the real estate was also denied; that the personal estate of *E. G. W.*, was far more than sufficient to pay his debts, &c.

The answer of *Reuben Warfield* admitted the bill, and consented to a decree.

On the 21st September 1844, the parties agreed to issue a commission.

On the 25th January 1845, the complainants amended their bill, to show, that two other of the notes mentioned in it, were given for the purchase money of land, of which *E. G. W.* died seized, which descended to his heirs at law, and in which his widow has a dower interest. Prayer, for relief, as before.

A commission was issued to take proof; much testimony was taken, which is sufficiently set forth in the opinion of this court.

After the commission was returned, *Nicholas Owens*, one of the complainants, filed his petition, alleging, that the real estate of the said *E. G. W.*, ever since his death, has been in the possession of his widow, the defendant, *E. B. W.*, who had cultivated the same in such an unskilful and wasteful manner, as greatly to lessen the value thereof; that he has reason to apprehend, that the same system of bad husbandry will be continued by the said defendant, unless restrained by this court; and further, that he has great reason for fearing, and verily believes, that said real estate, if now brought into market, would not sell for a sum sufficient to pay all the debts due by the deceased; and he is advised, that if the same cannot be now sold under the authority of this court, it should be placed in the hands of a receiver, to be managed or rented out for the benefit of the creditors of the deceased; or, if it is deemed expedient, to permit the said *E. B. W.* to retain possession, then, that an occupation rent should be assessed to be paid by her, and she ought to be restrained from cultivating the land, in a wasteful or unhusbandlike manner; and from wasting said land, or in any manner destroying or injuring the same, or cutting the wood or timber thereon, except for the necessary purposes of the said farm. That the commission heretofore issued for taking testimony, has been executed and

closed, and is now about to be returned, so that the cause may be heard, in a very few days, upon its merits, if the defendants are so pleased; and your petitioner hereby submits, to hasten the hearing of the said cause, in order that its merits may be discussed on the hearing of this petition. Prayer, for a receiver, or an occupation rent, as suggested in this petition; and that an injunction may be granted; and for other relief.

Certificates were filed, to show that the course of cultivation pursued was improper, &c.

The defendant, *Ellen B. Warfield*, answered the amended bill; and also answered the petition, denying its allegations, and insisting upon her right of possession, and management and cultivation, without interference by receiver and injunction, and the more so in this case, as the creditors of *E. G. W.* had not established their claims. She denied the commission of waste, or intention to commit any.

The petition was ordered to be heard at March term 1846, and leave given to take further proof, upon the the usual terms, which was taken and filed.

On the 28th April 1846, the Chancellor, (BLAND,) ordered, that a writ of injunction issue, as prayed by the petition, and that *Ellen B. Warfield* be charged with an occupation rent for the said land, from the time of the institution of the suit, until otherwise ordered, or the sale of the said land, or it shall have been surrendered by her. The amount of the said rent to be adjusted by the auditor, from the proofs now in the case, and from such other proofs as may be laid before him.

From this order, the defendants appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, SPENCE, MAGRUDER and MARTIN, J.

By R. J. BRENT for the appellants, and
By T. S. ALEXANDER for the appellees.

MAGRUDER, J., delivered his opinion as follows:

I signed the decree which was passed by the court in this case, but not for reasons which will be found in an opinion which has been filed. The reasons, which are set forth in that

opinion, for the decree, could not be my reasons for denying to the petitioner the relief which he sought; because, whether they exist in the case, I did not take the trouble to enquire; and because, if for such reasons the petition must be dimissed, then such an application could in no case be successful; for as soon as the chancellor ascertains that the complainants are creditors, and the personal assets are insufficient, he must proceed *forthwith* to decree a sale of the real estate. If such powers exist, it is obvious, that a case in which to ask for their exercise, never can arise:—a powerful reason for the conviction, that the court cannot, in such a case as this, appoint a receiver, or charge an occupation rent.

My reasons for dismissing the petition will be stated.

A simple contract creditor is entitled to all the relief, which the act of 1785, chap. 77, sec. 3, and its supplements, give to him. If the funds which the law of the land provides for the payment of the debts of a deceased person, (the personal assets and the proceeds of sale of real estate, devised or descended,) prove to be insufficient, the court of chancery can afford none other. If after the distribution of the real and personal estate, there yet remains a balance due to the creditors, they have, indeed, a right to that balance: but it is a right without any remedy, and must remain so until the legislature can provide some additional fund. To say that, if the two funds provided by the legislature proved to be insufficient, the court of chancery possesses jurisdiction inherent in it, or by virtue of any equitable maxim, to provide other remedies, to make the rents and profits a third fund for the payment of them, is to admit in that court the power of judicial legislation. The law may give to the courts power, and prescribe the mode in which that power may be exercised; or the latter may be omitted, because of existing rules, which will enable the courts to exercise the power. But if the power or right be such, "that according to their several modes of proceeding, neither of the courts, (common law nor equity,) can grant the proper redress, they cannot in any way supply the deficiency. Even upon *English* authority, a court of justice cannot be permitted, in any case, to legislate; and by the constitution of our republic, the three

departments having been directed to be kept separate, the judiciary has been expressly excluded from every species of legislation, and is precluded from supplying any omissions of the legislature, however obvious or necessary it may be, for attaining the object in view." 1 *Bland,* 47. It is true, indeed, that the time was, when, in *England,* very extravagant notions were entertained in regard to the court of chancery, and its own power to extend, according to the whim and caprice of its judge, its jurisdiction. "According to these notions," to use the language of *Blackstone,* "it would rise above all law, either common or statute, and be *an arbitrary legislature* in every particular case." Then it could find, in some of its maxims, which are often quoted without being understood: such as, " There can be no wrong without a remedy,"—the *germ* of all jurisdiction which it chose to usurp. " But this," *Blackstone* adds, " was in the infancy of our courts of equity, before their jurisdiction was settled."

That the court of chancery is not supposed, in *England,* to possess the power to supply defects in the law, under the pretext, that there can be no wrong without a remedy, and the court may, of course, provide one, if the law has omitted it, is shown by the cases spoken of by the commentator, in his *third volume, p.* 430 :—" Hard was the case of bond creditors, whose debtors devised away their real estate; rigorous and unjust the rule, which put the devisee in a better condition than the heir; yet a court of equity had no power to interfere." *See* the other cases there enumerated. The *hæres factus* then could not, in the court of chancery, or without express legislation, be made responsible for one cent of a debt of the testator, for the payment of which his *heirs,* to the value of the real estate which came to them from the debtor, were expressly bound. The devise could not be considered fraudulent against the creditor, although it was made, and had the effect to defraud him of one security, which he was supposed to have, for his debt. The courts were powerless, and a remedy for this hardship and injustice could only be given by parliament; and was given, for the first time, in 1691, (3 *Wm. and Mary,*) by a law, saying, that all devises should be void, as against creditors, and giving

to them the same right of action against the devisee, as they had against the heir. "The chancery court," says *Harrison*, (*1st Chan. Prac.*, 50,) "had been often attempting, before the statute, to make *the devisee* liable to specialty debts, but were not able to come at it; which was the occasion of the statute." And speaking of an attempt to recover of the devisees, without making them a party, the opinion of the court is given: "It is the act of parliament which makes this assets in the devisees hands, and that requires the heir to be made a defendant. You must follow the remedy therein prescribed."

Nothing of all this can be applicable to the court of chancery of *Maryland;* and it has powers and jurisdiction unheard of in *England* for centuries past, if, without any authority for it derived from the legislature, it can create an additional fund, (the rents and profits of the real estate, intermediate the death of the debtor, and the sale of his real estate,) to supply a deficiency which may exist, after the personal assets and proceeds of sale of the land have been exhausted. This cannot be maintained.

Much of the chancery system of our State, was, of course, borrowed from that of *England;* some little of it, it may well be thought, was, in the infancy of the colony, and its judicial system, no where to be found, but in the supposed wants, and local and other circumstances, of our people; in short, in what one of our eminent judges of other days called, "the common unwritten law of that court, *of domestic origin.*" Our statute book, however, clearly shows, that quite early,—years before the revolution—it was the settled policy of our State, to prevent any enlargement of the jurisdiction of the court, and even any change in its mode of proceeding, otherwise than by legislative enactment. How often this policy has been disregarded, not only occasional acts of legislation, but decisions of our courts, will evince. It is (to give one example,) deviated from, when modern treatises upon the practice of the court of chancery of *England*, as well as elsewhere, are introduced as the very best authority, to show what is the jurisdiction of, or the practice and correct mode of proceeding in, the chancery court of *Maryland.*

Very much of the chancery jurisdiction which it is daily exercising, and with which we are most familiar, (the authority to sell the real estate of deceased persons, is a part of it,) is what the law books call, its " statutory jurisdiction;"—"A jurisdiction, which begins and *ends*, in acts of parliament." 2 *Madd. Ch. R.*, 446. Of this portion of its jurisdiction, there is very much more in *Maryland* than in *England*. Now whatever may be said, of so much of its equity jurisdiction as was acquired, nobody can tell, when, or how; and whatever maxims it may have recourse to, in order to justify it in retaining and exercising, and occasionally adding to those branches of its jurisdiction, it is a settled maxim with respect to its statutory jurisdiction, that it ends where it begins, with the statute which confers it. It cannot pick up jurisdiction, because other courts which might rightfully have exercised it, have thrown it away; or bribe suitors to bring their claims *there*, by any promise, that it will afford them more *justice* than the law will allow them. It may exercise all that the legislature grants *to it*. But the grant of "an inch," will not, under any circumstances, justify it, in taking "an ell;" or the most minute fraction more than is granted. The legislative and judicial departments must be kept separate and distinct. There can be no supplements to any of our laws, unless they are to be found in our statute book.

The act of 1785, then, which gives to chancery no jurisdiction, in the premises, except to sell the real estate of a deceased debtor, and distribute the proceeds of sale, gives to that court no more power to make the rents and profits of the estate sold, a further fund, for payments of the debts, than it would have had to decree the sale of real estate, for the payment of simple contract creditors, if the act of 1785 had never been passed by the General Assembly.

I am thus brought to the question, (one upon which, for years, the Courts of Appeals and chancery differed so widely; and which, at one time, was likely to produce most unpleasant results,) did the court of chancery possess, before the law of 1785, authority to sell real estates of deceased debtors, for the payment of their simple contract and other debts?

The late Chancellor saw no such power granted by the act of 1785, and thought he must find it elsewhere. It was because of this opinion, that he was brought to the conclusion, that he had a right to decree an account of the rents and profits, to appoint receivers, fix occupation rents, &c.; and moreover, that it was not necessary for the creditors, in such a bill, to allege, or afterwards to prove, unless it was denied, an insufficiency of personal assets. If he was correct, in regard to the source whence was to be derived his authority to make real estate of deceased debtors answerable for their simple contract debts, it is undeniable that no such allegation or proof is necessary in bills of this description, and that the Court of Appeals has discovered some strange misconceptions of the law; but it would by no means follow, that he possessed the other powers, to appoint receivers, or decree an account to be taken of the rents and profits of the real estate, while enjoyed by the heir or devisee. The enquiry, however, now is, whence the jurisdiction of our court of chancery, to sell dead men's lands, to pay their debts?

There was a time, unquestionably, when the real estate of a deceased debtor, could not be sold to pay simple contract debts. Until 1785, there was no legislation, State or Provincial, which authorised such a sale. The power which our court of chancery had been exercising, without any doubt in regard to its existence for very many years, could not be borrowed from the chancery court of *England*, because, until very recently, no such power ever was possessed, or claimed by that court. How then could it be claimed, but in virtue of the act of 1785? The reasoning of the late chancellor, (one of whose orders is now under review,) is not to be found in the record before us, but in his own reports of his decisions, especially in the case of *Tessier and Wyse*, 3 *Bland*, 28. We have every thing that his powerful mind and extensive research could suggest, for the conclusions to which, (after an investigation more thorough than he, perhaps, ever gave to any other question,) he was brought. Before, however, stating the opinion of *Chancellor Bland*, it may be well to notice, what we can learn touching the opinions on the subject which had previously prevailed in

his court.  It will be found, that upon one point, (the jurisdiction of the court, independently of the act of 1785,) *Chancellor Hanson* ultimately adopted his opinion.  In other respects, so far as we can judge, he differed with all our chancellors.

Our act of Assembly was passed in 1785, and *Chancellor Hanson* was appointed 1st October 1789; of course, but few cases arising under that law could have been disposed of before his appointment.  In 1797, he said, that the court of chancery had never, *up to that time*, decreed the sale of the real estate of an *adult* heir or devisee, to pay the debts of a deceased ancestor, or devisor.  Of course, it would seem that, he had no idea at that time, that the court possessed any power in such cases, other than that which the act of Assembly conferred upon it.  It must have been then, doubtful in his mind, whether, if the heir or devisee was not an infant or *non compos*, the creditor of a deceased debtor had a remedy *in chancery;* whether that court had any power to decree for such a purpose, the sale of land which had descended, or been devised, to an adult; unless he was a *non compos*.  It is certain, that, at that time too, a notion prevailed, to some extent, that creditors could sue *at law* the heir or devisee.  Of this we have proof in *Preston vs. Preston*, 1 *Harr. and Johns.*, 366, decided in 1802; and *Lodge and others, vs. Murray's heirs*, 1 *H. & J.*, 499, decided in 1804.  According then, to what seems to have been the then opinion of legal men, it might be that simple contract creditors had a remedy, although the land had descended, or been devised to one, who was neither an infant, nor *non compos*. No body as yet, it would seem, thought that he had any *in equity*, unless given by the act of 1785.  Whether it existed at law, was to be decided in the case of *Preston and Preston*, and in that case it was decided, that "at law, the heir cannot possibly be answerable, unless sued *as heir*, and *unless he had promised to pay the debt*.  This was again decided, (both of the decisions by the *General Court*,) in the case of *Lodge and others, against Murphy's heirs*.  From either of these decisions there was no appeal, and it has ever since been considered, that they settled the law in *Maryland;* though it may be inferred from what they have left behind them, that neither

*Chancellor Hanson,* nor *Chancellor Bland,* agreed with the *General Court.*

The first decision was at October term, 1802; and on the 23rd December 1803, *Chancellor Hanson,* in the case of *Tyson and others, against Hollingsworth and others,* was called upon to revise what seemed to be his opinion in 1797, that if the heir or devisee was an adult, unless he was *non compos,* the simple contract creditor had no remedy in equity, until further legislation in the premises. He states, that in one case "he had refused to execute the power," although the heir himself, the only person who had a right to object to its exercise, had expressed a willingness that he should exercise it. See *Chan. H's Opinion,* 2 *Bland,* 328, *note.* It is quite evident that he could not comprehend the subject, as it was presented to his mind by the decisions of the *General Court.* He concluded, "that he might have done wrong" previously, and thenceforth until his death, passed such decrees, and distributed the proceeds of sale, and then evidently supposed, that he had no further jurisdiction:—no power to take an account of the rents and profits.

Upon the death of *Chancellor H.,* two years afterwards, *Chancellor Kilty* was appointed, and it is known, that notwithstanding what had been the decision of his predecessor in the case just noticed, he had great doubts and difficulties touching this branch of the jurisdiction of his court; and after struggling some years to surmount them, he acted like a sensible man, in prevailing upon the legislature to cut the knot, which it had been so difficult to untie, by enacting, (1818, *chap.* 193, *sec.* 3,) that the provisions of the act of 1785 should be extended to defendants of full age. This, one might have thought, would prove a "statute of repose," and such it was for years. *Chancellor Kilty,* of course, was satisfied with a law, which it is believed he penned; and he was succeeded by *Chancellor Johnson,* who, when he found that our acts of Assembly gave him the jurisdiction which at any time he was called upon to exercise, was not over anxious to know, whether this court did not possess it, and might not have exercised it, without any act of Assembly.

After the death of *Chancellor Hanson*, and until the death of *Chancellor Johnson*, it was the belief of chancellors and lawyers, that all the power which the court possessed, to sell the real estates of deceased debtors, to pay their simple contract debts, was conferred *and limited* by the act of 1785, and its numerous supplements, referred to in *Dorsey's Laws, pp.* 210, 211; and of the many hundreds of debtors, whose real estate was sold to pay their debts, and proved to be insufficient, there is not one instance, during all that time, of a bill being filed against the heir or devisee, to account for the rents and profits. The particular remedy was given by law, and it might well be thought, as *Chancellor Talbot* once said, that "it would be very improper, for a court of equity to take it up, where the law leaves it, and extend it further than the law allows."

When *Chancellor Bland* came into office, and this branch of the jurisdiction of his court was brought under his consideration, reading, perhaps, the opinion of *Chancellor Hanson*, before referred to, and being a man of great research and industry, and perhaps, rather over-anxious to find out, what could not be found out; and what, if it could have been found out, would have been of no value to a chancellor, he chose to know all about it. He took up the act of 1785, just as if it was a law recently enacted, and was yet, for the first time, to receive an interpretation, and was brought to the conclusion, that the meaning of the act of 1785, without any of its supplements, was entirely misunderstood, and that until the supplement of 1818, chap. 193 was passed, it did not authorise the court to pass very many of the decrees, which it had passed, to sell the land of adult heirs and devisees, for payment of the debts of those, from whom they claimed it. As, however, the power had been exercised so repeatedly between 1785 and 1815, the court, he thought, must have possessed it before the latter year, and it must have been a branch of its jurisdiction before 1785. The difficulty yet to be surmounted, was, to fix the time when, and the mode in which, this power, which his court had so long exercised, was acquired by it. The era ultimately fixed upon, was a day on which a statute of *George 2nd* passed, in 1732, (5 *Geo.* 2, *chap.* 7,) took effect. *See* that statute, 3 *Bland*, 305, *note.*

Much might be said upon the subject, and perhaps, on both sides of it, if this was still to be regarded as *res nova*. At one time indeed, its jurisdiction was claimed, "inasmuch as an executor or administrator is suable in this court, on the ground of discovery, and land is, in this State, liable for all debts, as well as the personal estate." But, in the first place, the creditors have no right to a discovery *in chancery*, unless they are entitled to relief, *somewhere*, at law or in equity; and we are yet to find out, when and how, or whether *at all*, they have any title to relief, by a sale of the debtor's real estate. An answer to the notion, that the heir is suable in equity, because an executor is, on the ground of discovery, will be found in a decision by this court, (not reported,) that the executor is not suable in equity by a creditor, upon any such ground. The truth is, either the act of 1785, or the statute of *George 2nd*, just spoken of, give to chancery the jurisdiction, now to be ascertained; or a branch of jurisdiction, of which the court has been in the undisputed exercise for so many years, never was any part of its jurisdiction. The learned judge, whose order is now under review, denies that it can be found in the act of 1785, but maintains that it is conferred by the statute of *George*. Now it will not be alleged, that the act of Assembly cannot be read, without being understood to confer all the jurisdiction, which it was supposed, and it is thought to confer. Some change in the structure of some of its sentences, some transposition of its words, and perhaps the omission of some of its words, may be required, in order to give to it the construction which it would seem to have received; though after all, perhaps, less violence needs to be done to its language, than has been done to many sections of the statute of frauds, in order to ascertain what was intended to be its import. But as to the statute of *George*, alluded to, no transposition of words, no rules of *misinterpretation*, yet invented by the wisdom of man, will make that statute, in any way, beneficial to *simple contract* creditors of deceased debtors, or enable the court of chancery, to exercise any power whatever, in such cases. The relief which it gives is confined to judgment creditors, and authorises in satisfaction of their debts, a sale of land, *upon*

*which they already have a lien.* The introduction of the words, "lands and tenements," into the writ of *fieri facias*, immediately after the words, "goods and chattels," it has been understood, was because of, and as far as the courts could execute it, a compliance with, the requisitions of the section of the statute, which it is now supposed, gave so much business to the court of chancery. Hence his decree in favor of the complainant, in the case of *Tessier and Smith, against Wyse*, in which there were adult defendants; in which the bill did not allege a deficiency of personal assets, and in which, certainly no such deficiency could be proved. From that decree an appeal being taken, it was reversed by this court. See 4 *G. & J.*, 295, and expressly for the want of the allegations and proof which was required by the act of 1785, and which no other law, statute or common, of this State, ever had required. So too in 6 *G. & J.*, 446, speaking of what is required by the act of 1785, "the exercise of such jurisdiction must be warranted, both by the pleadings and the proof, or the decree cannot be sustained." It might well have been expected, that when the highest judicial tribunal had thus decided, there would have been an end to all the controversy that had arisen, or might arise, in consequence of the seeming obscurity in the act of 1785. If the words of the law, left its meaning doubtful, the interpretation of it, now given by the court of last resort, could not well be misunderstood. The act of 1785, gave to creditors who sought a sale of the real estate of their deceased debtor, the remedy, and the only remedy which they had, for if not the only remedy, how could it be necessary to allege and to prove, all that was required by that law, but by none other to be alleged and proved? That law states the relief which it is designed to give to creditors. The chancellor shall decree a sale of the land, to pay the debts. Surely there needeth to be a supplement to that act of Assembly, in order to give to the creditors another fund, in addition to those already provided. A sort of supplement to this act, is supposed to be found, not indeed in any thing in the form of an act of Assembly, but in the words, which in the case of *Curtis against Curtis*, 2 *Brown's Chan. Cases*, 633, are ascribed to the then

Master of the Rolls: "It is the practice in equity, that bond creditors, *coming for a distribution of assets*, shall have an account of the rents and profits, which they could not have at law. . The law gives the creditor only the land *to hold*, until he is satisfied. Equity goes further and says, that if the remedy at law is not sufficient, we will sell the inheritance of the estate; and if that will not do, we will direct *an account of rents and profits against the heir*." This was certainly an *obiter dictum*. They are words, supposed to have been uttered by the Master of Rolls, in the case of a widow suing for dower, and a claim, that the rents and profits to which she was entitled, should be decreed to her in that suit. Now we are reminded, by the quotation, that the law of *England*, and that of *Maryland*, is in some respects different. Land is *sold* here to pay debts, while in *England*, all that the creditor can usually claim, is a portion of the rents and profits, until thereby the debt is satisfied. Owing to this diversity, we may misunderstand what we sometimes read in the *English* books, about the creditors being entitled to rents and profits.

The law, however, is frequently stated in law books, as stated above by the Master of the Rolls; and generally, it may be noticed, upon the authority of that *dictum, bond* creditors may come into equity, and this to prevent a multiplicity of suits. Each creditor may sue at law, but to avoid this multiplicity of suits, they are permitted *in equity* to unite in one bill, and therein ask, a distribution of the real assets which descended to the heir.

We are sometimes referred to *Bacon's Abridgement, Accompt B,* as well stating "the gradual development of equity jurisdiction, in cases of tort, mesne profits, &c. There we are told, that chancery will not interfere in favor of *judgment* creditors, even to set aside a fraudulent conveyance, and to decree an account against the debtor and owner of the estate, nor in favor of a mortgagee against a mortgagor.

The question, in what cases the chancery court can decree an account of rents and profits, is one not free from difficulty; and no wonder, if it be true, as the books tell us, that the principle upon which courts of equity proceed in such cases, is the

principle of *convenience.* No wonder then, if we sometimes are at a loss to ascertain its jurisdiction, the extent of it, or the principle upon which it is to be claimed. It would, indeed, seem difficult to prove, that a man who has no title, legal or equitable, to land, never was in the possession, or could rightfully demand possession of it, has any claim to rents and profits. In the case of *Strike and McDonald,* 2 *H. & G.,* 191, it was said, that where there has been any fraud, an account of the rents and profits will be ordered. But that case furnishes no authority for the claim in this case, and the law would be absurd and unjust, if the heir should be made to pay rents and profits in a case like this, when, if he had been the debtor, had mortgaged the property to pay the debt, he is not accountable to the creditor for rents and profits which he has received, although the land furnishes an insufficient fund for the payment of the mortgage debt.

According to every view which I have been able to take of the subject, the chancellor erred in passing the order, because, in such a case, he has no right to decree an account of the rents and profits.

A further remark will be made. The court cannot have the power, because it could not possibly exercise it. No portion of it is to be exercised until the claims, and the insufficiency of personal assets are established; and these can be established, only by the decree, which appoints a trustee to sell the land. No order can be passed in regard to the rents and profits, *pending* the suit, because until a decree for the sale, and actual sale, and the ascertainment, that the real, added to the personal assets, do not pay the debts, the creditors have no right to file a bill, or petition, asking for any discovery, relative to, or on account of, the rents and profits.

Dorsey, J., delivered the opinion of this court.

The act of Assembly having made the real estates of deceased debtors, whose personal estates are insufficient for the payment of their debts, liable by a decree of the court of chancery, to be sold for the payment of such debts; should both real and personal estate prove inadequate to such payment, if rents, issues

and profits of such real estates be, before the sale, received by the heirs of the deceased, or any other persons, the heirs or persons thus receiving, will, in contemplation of a court of equity, be regarded as having done so for the benefit of the creditors of the deceased.    And upon *a proper bill*, filed for the recovery thereof, such receivers will be made to account to the creditors for the rents and profits by them received.    This accounta- bility results from a clear principle of equity jurisdiction, that where the right is clear, and the law can give no adequate remedy, a court of chancery will relieve.    Upon the death of a debtor, whose real and personal estate are insufficient for the payment of his debts, the real estate in equity, is considered as appropriated to such payment; and its incident, the rents and profits, pass with it.    That these views are not unsustained by the analogies of the law:—See 1 *Story Eq.*, 488, 512. *March vs. Bennett*, 1 *Vern.* 428.    *Curtis vs. Curtis*, 2 *Brown's C. R.*, 633.    *Hammond vs. Hammond*, 2 *Bland's C. R.*, 344.

The accountability in question being assumed, the power of a court of equity, when a proper case is brought before it, for the exertion of such a power, to appoint a receiver of the rents and profits of the real estate, or to impose upon its occupant an occupation rent, cannot be doubted.    But does the record before us present a fit case for the exercise of such a power? is the question to be decided by this court, in reviewing the chancellor's order, from which the present appeal has been taken.

By the original and amended bill of the complainants, no such relief is sought; a sale of the realty in aid of the personalty, for the payment of debts, is all the relief, in respect to the realty, that is called for.    The bill alleges, that *Eli G. Warfield*, the deceased, left a personal estate of large value, which came to the hands of his administrators, of whom the defendant, *Ellen B. Warfield*, was one, but that the personal estate is insufficient for the payment of debts.    The defendant, *Ellen B. Warfield*, the mother of the infant defendants, by her answer denies, that the personal estate is insufficient for the payment of debts; denies the existence of the debts claimed; and pleads the statute of limitations in bar of their recovery.

After a great variety of testimony was taken by the parties, under a commission issued for that purpose, no part of which showed the insufficiency of the personal estate for the payment of debts, or that any other debts existed, other than those due to the complainants; and although the complainants had caused no audit to be made as to the personal estate, and had exhibited an inventory of the deceased's personal estate, appraised at the sum of $4173.76, and had given evidence also of a debt of $1000 due to the deceased *Nicholas Owens*, one of the complainants filed his petition, in the court of chancery, alleging, that the real estate of the deceased, ever since his death, had been in the possession of his widow, *Ellen B. Warfield*, who was cultivating it so wastefully and unskilfully, as greatly to lessen its value; and that he had reason to apprehend the same system of husbandry would be continued, unless restrained by said court; and "further, that he has great reason for fearing, and verily believes, that said real estate if now brought into the market, would not sell for a sum sufficient to pay all the debts due by the deceased." The petition also prays for the appointment of a receiver, or, in the event of its being deemed expedient to permit *Ellen B. Warfield* to retain possession, that she should be charged with an occupation rent; and that an injunction may issue, to restrain her from cultivating the land in a wasteful and unhusbandlike manner; and from wasting the land in any manner, or destroying, or injuring or cutting the wood or timber thereon, except for the necessary purpose of the farm. *Mrs. Warfield*, having filed her answer, denying all the material allegations in the petition, a great variety, of testimony was taken by the parties; and upon its return to the chancery court, the order of the 28th of April 1846 was passed, directing an injunction to issue as prayed for in the petition, and placing *Mrs. Warfield* under an occupation rent, to be adjusted by the auditor. From this order an appeal was taken by *Mrs. Warfield*, and the propriety of its passage, upon the proceedings and proofs before the chancellor? is the question which this court are called on to determine.

After an attentive perusal of the petition, answer, and testimony taken in relation thereto, we are unable to discover any sufficient ground for granting the injunction, which has been ordered. And looking to the whole record, and the proofs therein contained, there is quite as little ground for the chancellor imposing, at the instance of the petitioner, *Owens*, an occupation rent upon the defendant, *Mrs. Warfield*. To entitle the petitioner to such an order, he must show, that it was necessary for his protection from loss, or that he had a right to demand it, because of the certainty, or strong probability, that the real and personal estate of the deceased, would be insufficient for the payment of his debts. Has this been done? is, then, the natural inquiry. It is true, that in his petition he has sworn, "that he has great reason for fearing, and verily believes, that said real estate, if now brought into the market, would not sell for a sum sufficient to pay all the debts due by the deceased." But fear and belief, unsustained by facts, establishing their probability, or shewing them to be well founded, are not a sufficient foundation for the interposition of a court of equity, by way of injunction, or the imposition of an occupation rent, in a case like the present. He who seeks such relief must show himself, in equity and conscience, entitled to it: that he has rights, which need, and deserve such protection. Is such the predicament of the petitioner? By his own proof he has shown, that the appraised value of the deceased's personal estate in the inventory thereof, was $4173.76, and that one of the debts due to the deceased, which *Mrs. Warfield*, expected to receive and apply to the payment of his debt, was one thousand dollars; and that the value of the real estate was five thousand dollars. The amount of the debts claimed by the complainants, if fully established, is between three and four thousand *dollars*; and that there is now, or ever was, any other creditor of the decedent, the record furnishes no proof. In such a condition of this case what standing has the petitioner in a court of equity, when asking an injunction, and the assessment of an occupation rent, against the widow of the deceased, who lives upon the land of the deceased, and with the rents and profits thereof supports

herself and his infant children. The real estate of a deceased debtor, is not primarily liable for the payment of his debts. For that purpose it is but an auxiliary to the personal fund; and is only answerable to creditors, to the extent of its deficiency. In the case, as now before us, upon the proofs in the record the personal estate appears to be sufficient for the payment of debts, and there is, therefore, no ground for the complainant's pursuit of the realty; much less for the injunction and occupation rent, which have been granted at the instance of the petitioner. And it is a fact somewhat remarkable, that the "fear and belief" of the petitioner, upon which the chancellor's order was founded, were not, that the real and personal estates, united, would prove insufficient for the payment of debts; upon which hypothesis, only, could the order of the chancellor be sustained; but that the petitioner "has great reason for fearing, and verily believes that said *real estate*, if now brought into market, would not sell for a sum sufficient to pay all debts due by the deceased." For aught that has been sworn to in that petition, the personal estate may have been amply sufficient for the payment of debts; and the petitioner may not have a semblance of right to pursue the realty.

This court will sign a decree, reversing the order appealed from, with the costs of this appeal to the appellant, and dismissing the petition of the appellee on which the order appealed from is founded.

<div style="text-align:center">

ORDER REVERSED, AND PETITION
DISMISSED WITH COSTS OF APPEAL.